# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| COREY A. MOORE,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | Civil Action No. TDC-15-3992<br>Criminal Action No. TDC-10-0648 |

## MEMORANDUM OPINION

Corey A. Moore has filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 ("2255 Motion"). In his Motion, Moore challenges his conviction in the underlying criminal action on the basis that his trial counsel operated under a financial conflict of interest such that his waiver of his right to a jury trial was invalid. On July 18, 2017, the Court held an evidentiary hearing at which it heard testimony from Moore, attorney Brian McDaniel, and former Assistant United States Attorney Jonathan Lenzner. *See* 28 U.S.C. § 2255(b) (2012). The parties have since filed supplemental briefing as requested by the Court. For the reasons set forth below, the Motion is denied.

## BACKGROUND

On October 20, 2010, Moore was charged with possession with intent to distribute cocaine hydrochloride, possession with intent to distribute one kilogram or more of phencyclidine (PCP), possession of firearms in furtherance of a drug trafficking crime, and possession of firearms and ammunition by a convicted felon. After initially receiving appointed counsel, Moore retained Vandy L. Jamison, Jr. as his attorney on October 28, 2010 before

retaining attorney Brian McDaniel, who became the attorney of record on November 12, 2010. McDaniel continued to represent Moore through July 10, 2013.

Moore wanted McDaniel to represent him because of his reputation as one of the best defense attorneys and someone who would "fight" on behalf of his clients. They entered a retainer agreement under which Moore and his family would pay $30,000 for the representation through the trial, with the expectation that the full amount would be paid prior to the trial date. In 2011, after paying $15,000 of the retainer fee up front, Moore and his family were unable to make further payments toward the $30,000 total. According to Moore, during their initial meeting in or about January 2011, McDaniel told him that if the remainder of the payments were not made, the only way he would be able to represent him would be through a bench trial. Moore told McDaniel that he did not want to have a bench trial and would try to pay the full retainer fee. McDaniel denies telling Moore that if he was not paid in full, he would conduct only a bench trial.

On January 2, 2011, McDaniel filed a Motion to Suppress Tangible Evidence in which he argued that evidence seized pursuant to a search warrant should be suppressed because the search warrant affidavit did not establish probable cause. According to McDaniel, he had discussed the motion with Moore before filing it. On April 13, 2011, United States District Judge Alexander Williams, Jr. granted the motion. After the Court denied the Government's Motion for Reconsideration on May 31, 2011, the Government filed an interlocutory appeal. On April 24, 2012, the United States Court of Appeals for the Fourth Circuit reversed the district court's decision on the Motion to Suppress, upholding the inclusion of the evidence under the good faith exception. The case was remanded to the district court for trial.

The Court then scheduled a jury trial for October 30, 2012. Prior to that trial date, McDaniel had several conversations with Moore about waiving his right to a jury trial. According to McDaniel, he recommended a bench trial because Judge Williams had ruled in Moore's favor on the suppression motion and had been troubled by the information upon which the officers relied in getting the search warrant. McDaniel therefore thought that if there was "some gray area," Judge Williams might rule in Moore's favor. He also believed that, even if evidence about Moore's history was not formally admitted at trial, Judge Williams was aware that Moore, who had been acquitted in several other cases, had a reputation as the "Teflon defendant," which was relevant to the defense theory that the Government planted evidence on him. McDaniel notified the prosecutor, Assistant United States Attorney Jonathan Lenzner, that Moore would be seeking a bench trial. According to Lenzner, however, McDaniel described the request for a bench trial as Moore's idea and stated that he was trying to talk Moore out of it.

As it turns out, the October 2012 trial date was continued after the Government disclosed shortly before trial that certain swabs taken of the firearms in question had never been tested for DNA. Although McDaniel believed that such testing was not necessary, Moore successfully insisted that McDaniel push to have the tests conducted before trial. As a result of the testing, the jury trial was rescheduled to February 5, 2013. According to Moore, prior to this trial date, McDaniel again told him that if he was not paid the remainder of the retainer fee, he would conduct only a bench trial. Moore asserts that he acquiesced to waiving a jury trial and proceeding with a bench trial because he had no other choice since he had retained McDaniel and believed he was therefore "stuck" with him. According to McDaniel, he never threatened that he would refuse to conduct a jury trial if his full retainer fee was not paid, and the decision to seek a bench trial was, as before, based on trial strategy. McDaniel also testified that he has had other

3

clients who had not fully paid the agreed upon legal fees, but those clients never waived their right to a jury trial.

On February 5, 2013, the date the trial was to begin, McDaniel filed a waiver of jury trial signed by Moore. At the Government's suggestion, Judge Williams conducted a colloquy in open court about the waiver in which he explained Moore's right to a jury trial, including the requirement that 12 jurors rather than a single judge would have conclude that the government has proven his guilt beyond a reasonable doubt in order to sustain a conviction, and confirmed that Moore wished to proceed with a bench trial. Satisfied that Moore was acting knowingly and voluntarily in waiving a jury trial, Judge Williams accepted the waiver and began the five-day bench trial. The bench trial concluded on February 11, 2013. Moore was found guilty on all four counts.

Meanwhile, on February 3, 2013, concluding that Moore could not afford to pay him, McDaniel had filed a Motion for Appointment of Counsel Pursuant to the Criminal Justice Act ("CJA") in order to receive attorney's fees from the Court. At the end of the first day of the bench trial on February 5, Judge Williams discussed, as an *ex parte* matter, the CJA motion with McDaniel. In the discussion, Judge Williams described the restrictions on CJA funding available. On February 6, 2013, McDaniel's CJA motion was granted, effective February 4, 2013. The Order allowed McDaniel to bill for reasonable time from the first day of trial until sentencing and stated that "the compensation limit is capped at actual hours not to exceed 77.6 hours or $9,700.00." Order, ECF No. 67. Moore asserts that he was not informed either before his waiver or during the trial that McDaniel had requested or been approved for CJA funds.

On June 3, 2013, Moore was sentenced to a total of 271 months of imprisonment. On June 5, 2013, Moore moved to have McDaniel withdraw as counsel for his appeal because of

"adversarial differences." Mot. Withdraw, ECF No. 103. McDaniel filed his own Motion to Withdraw as Counsel, stating that differences "about certain trial decisions and how best to posture the Defendant at Sentencing" began "[a]fter the verdict and prior to the sentencing in this matter." Mot. Withdraw, ECF No. 128-6. The Motion to Withdraw was granted on July 10, 2013.

After Moore's conviction was affirmed on appeal, Moore filed identical Motions to Vacate pursuant to 28 U.S.C. § 2255 on December 28, 2015 and January 8, 2016. Separately, Moore filed a Motion to Reduce Sentence under Amendment 782, to which the Government noted its consent. The Court granted the Motion to Reduce Sentence on December 16, 2016, reducing Moore's term of imprisonment to a total of 211 months.

## DISCUSSION

In his 2255 Motion, Moore identifies two related constitutional grounds for relief. First, he asserts that McDaniel "operated under a 'financial conflict of interest' when he chose to forgo a jury trial in favor of a bench trial for movant solely because movant could no longer afford his representation for the more extensive jury trial." 2255 Motion 9, ECF No. 117. Second, he alleges that his waiver of jury trial was invalid because McDaniel "presented the waiver of jury trial to movant as the only alternative course of action under the financial circumstances that restrained counsel's representation to that of a bench trial," even though McDaniel had "procured [CJA] funds to cover representation." *Id.*

### I. Legal Standard

A prisoner in federal custody may move to vacate, set aside, or correct his sentence on the basis that: (1) "the sentence was imposed in violation of the Constitution or laws of the United States"; (2) the sentencing court lacked jurisdiction; (3) the sentence exceeded the

maximum authorized by law; or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). The petitioner bears the burden of proof and must establish the claim by a preponderance of the evidence. *See Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958).

The Sixth Amendment to the United States Constitution affords a criminal defendant the right to "Assistance of Counsel." U.S. Const. amend. VI. The United States Supreme Court has stated that "assistance which is ineffective in preserving fairness [of a trial] does not meet the constitutional mandate." *Mickens v. Taylor*, 535 U.S. 162, 166 (2002). A petitioner alleging ineffective assistance of counsel in violation of the Sixth Amendment must ordinarily meet the standard established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under this standard, the petitioner must show both deficient performance and prejudice—that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *id.* at 687, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

Where counsel acts under an actual conflict of interest, however, prejudice is presumed, because the "likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary." *Mickens*, 532 U.S. at 166; *accord United States v. Stitt*, 552 F.3d 345, 350 (4th Cir. 2008). In order to fall within this presumption, the petitioner must demonstrate "that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). To establish such an adverse effect, a petition must "identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued," "show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision," and "establish that the defense

counsel's failure to pursue that strategy or tactic was linked to the actual conflict." *Stitt*, 552 F.3d at 351 n.4 (quoting *Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001), *aff'd*, 535 U.S. 162 (2002)).

The parties agree that *Strickland* governs Moore's claim as to the validity of his waiver of his right to a jury trial, but they dispute whether *Cuyler* or *Strickland* presents the proper framework for analyzing his financial conflict of interest claim. In *Cuyler*, the actual conflict of interest arose from the attorney's joint representation of multiple defendants with conflicting interests. 446 U.S. at 348. In *Mickens*, however, the Supreme Court noted that Courts of Appeals have applied *Cuyler* to "alleged attorney ethical conflicts" beyond this scenario. *Mickens*, 535 U.S. at 174 (quoting *Beets v. Scott*, 65 F.3d 1258, 1266 (5th Cir. 1995)). While stating that the language of *Cuyler* "does not clearly establish, or indeed even support, such expansive application," the Court left open the question of whether it should be extended to other cases. *Id.* at 174-75. Courts of Appeals differ on the issue, including in the context of allegations that counsel operated under a personal or financial conflict of interest. *Compare Beets v. Scott*, 65 F.3d 1258, 1271-72 (5th Cir. 1995) (declining to apply *Cuyler* to a claim of a conflict between counsel's self-interest and the client's interest), *with Caderno v. United States*, 256 F.3d 1213, 1218-19 (11th Cir. 2001) (considering an alleged financial conflict of interest under *Cuyler*).

As acknowledged by the Government, the Fourth Circuit is among the courts that apply *Cuyler* outside of multiple representation cases. *See, e.g., Stitt*, 552 F.3d at 350; *Rubin v. Gee*, 292 F.3d 396, 402 n.2 (4th Cir. 2002). In *Stitt*,[1] the Fourth Circuit considered a claim that the

---

[1] In their supplemental briefing, the parties discuss an earlier opinion in *Stitt*, which was later recalled by the Fourth Circuit. *United States v. Stitt*, 441 F.3d 297, 300-01 (4th Cir.), *opinion*

7

petitioner's lawyer "labored under a financial conflict of interest" under the *Cuyler* standard. 552 F.3d at 350. There, the alleged financial conflict of interest was that defense counsel did not retain investigators in North Carolina, even though doing so would have been a reasonable choice under the facts of the case, because he was required to pay for all case-related expenses out-of-pocket pursuant to a retainer agreement. *Id.* at 349. The court acknowledged that:

> When counsel is burdened by an actual conflict of interest, he breaches the duty of loyalty, perhaps the most basic of counsel's duties. In such cases, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Because of this difficulty in measuring prejudice and the seriousness of a conflict of interest, prejudice is presumed . . . if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance.

*Id.* at 350 (internal citations and alterations omitted) (quoting *Strickland*, 466 U.S. at 692). While a fee dispute does not ordinarily establish an actual conflict, *United States v. Oliver*, 406 F. App'x 808, 811 (4th Cir. 2011), this Court concludes that under *Stitt*, if an actual financial conflict is established, *Cuyler* is the appropriate framework to apply to Moore's claim.

## II. Ineffective Assistance of Counsel

In seeking to establish ineffective assistance of counsel based on a conflict of interest under *Cuyler*, Moore has met the first two prongs in that he has articulated an alternative defense tactic, specifically, declining to waive a jury trial, and that tactic was objectively reasonable. *See Stitt*, 552 U.S. F.3d at 351 n.4. The issue is whether "the defense counsel's failure to pursue that strategy or tactic was linked" to an actual conflict of interest. *See id.*

The parties agree that McDaniel recommended that Moore waive his right to a jury trial and request a bench trial. The parties further agree that Moore, in fact, executed such a waiver and told Judge Williams, during a colloquy on the jury trial waiver, that he understood his right

---

*recalled by* 459 F.3d 483 (4th Cir. 2006). The court's December 24, 2008 opinion, however, has not been recalled and is binding on this Court.

to a jury trial and nevertheless wished to waive it. The parties differ, however, on the motivation for McDaniel's recommendation of a jury trial, specifically, whether it was based on a financial conflict of interest. Moore asserts that McDaniel told him that unless McDaniel was paid the remaining $15,000 owed on the $30,000 retainer, he would not represent Moore at a jury trial. McDaniel denies this allegation and instead explains that he recommended a bench trial for strategic reasons, including because he believed that Judge Williams would be unfavorably disposed to the Government at trial because he had granted Moore's motion to suppress, later reversed on appeal, on the basis that the search warrant affidavit in the case did not establish probable cause. With such diametrically opposed accounts, the central issue on this Motion is a factual one that turns on the credibility of the witnesses.

Having observed McDaniel's demeanor in testifying, and upon consideration of the evidence presented at the hearing, the Court concludes that McDaniel testified credibly that he recommended a bench trial for strategic reasons, not economic reasons. McDaniel has been a member of the bar in good standing for over 20 years and is an officer of the court. Beyond the oath taken at the evidentiary hearing, McDaniel is bound by his oath as a member of this Court. Where McDaniel's livelihood depends on his continued admission to the bar, he had a strong incentive both to testify truthfully during the evidentiary hearing and to refrain from coercing a client to waive his right to a jury trial against his will because such a decision might be in his financial interest. Particularly where it is undisputed that the evidence presented at the trial was the same as would have been presented at a jury trial, the only alleged benefit to McDaniel would have been the ability to avoid a few hours of work relating to jury selection and possibly the preparation of relatively standard proposed jury instructions, hardly enough to justify risking one's law license.

By contrast, Moore, currently serving a 211-month sentence, does not have a comparable incentive to tell the truth and has much to gain by overturning his conviction and receiving a new trial four years later. Significantly, Moore has a history of testifying falsely. In rendering the verdict, Judge Williams stated with respect to Moore's testimony that "his credibility is just shot with me" and "I cannot find that the testimony that you presented on the stand was credible. It just wasn't, it wasn't believable." Trial Tr. (Feb. 11, 2013) at 149, 151, ECF No. 112. Then, at sentencing, Judge Williams found that an obstruction of justice enhancement was warranted where he found that Moore's trial testimony was "totally incredible and untruthful." Sentencing Hrg. Tr. at 36, ECF No. 113.

Several other factors point in favor of McDaniel's account. First, Judge Williams found, after a colloquy with Moore, that Moore knowingly and voluntarily waived his right to a jury trial. Judge Williams specifically described a jury trial to Moore, including the potential advantage that 12 jurors would have to agree on guilt in order for Moore to be convicted, and concluded based on Moore's responses and demeanor that he was acting knowingly and voluntarily. Although Judge Williams did not specifically ask whether Moore was threatened or pressured into the waiver, the record provides no evidence that Judge Williams observed any signs of such coercion. Notably, Moore had significant experience with the criminal justice system and had been a defendant in a jury trial on 10 prior occasions and thus was well aware of the right he was forgoing. A defendant's subjective state of mind is relevant to an evaluation of whether a waiver of a right to a jury trial is knowing, intelligent, and voluntary. *Cf. Otte v. Houk*, 654 F.3d 594, 605-06 (6th Cir. 2011) (concluding that the lower courts properly examined evidence of the suspect's "subjective mental state during the relevant time period" in its analysis of whether a *Miranda* waiver was "knowing and intelligent, as opposed to merely voluntary");

*Iaea v. Sunn*, 800 F.2d 861, 866 (9th Cir. 1986) (stating that voluntariness of a guilty plea includes a consideration of the "subjective state of mind of the defendant"). Where Moore fully understood the nature of a jury trial, his failure to insist on it when given the opportunity to do so before Judge Williams belies his claim that his waver was not knowing and voluntary.

Second, Moore's claim that he was coerced into waiving his right to a jury trial under the threat that he would have no attorney at trial is also inconsistent with the other available evidence. Having previously changed retained counsel when he released attorney Vandy Jamison and replaced him with McDaniel, Moore understood that he had the option to find different counsel. Even if he believed he no longer had the funds to pay counsel, Moore was informed at his initial appearance that he had a right to counsel and that if he could not afford one, the Court would appoint one to represent him. In fact, he had initially been represented in this case by court-appointed counsel. Particularly where Moore had been involved in numerous criminal cases and gone to trial 10 times, it strains credulity to believe that Moore would have felt that he no alternative but to continue with McDaniel and submit to a bench trial.

Third, throughout the case, even though Moore had not paid the last $15,000 of the retainer, he had not shied away from pressing for McDaniel to take additional steps that he believed to be necessary to advance his case. For example, when the Government informed McDaniel shortly before the October 2012 trial date that it had failed to conduct a DNA test on a piece of evidence, Moore overrode McDaniel's recommendation that they nevertheless proceed to trial and insisted that the DNA test be conducted, even though it would result in a continuance. McDaniel assented to this approach. Then as they prepared for trial, Moore persuaded McDaniel to call more witnesses at trial than McDaniel would otherwise be inclined to call. These episodes shows that Moore, if actually confronted with an ultimatum that he accept a bench trial,

would likely have pushed back, and that where McDaniel had previously acquiesced to his demands, it is difficult to believe that Moore would have been forced to waive his right to a jury trial against his wishes.

Fourth, McDaniel's performance as an attorney throughout the case was also inconsistent with the actions of an attorney who would seek to deny his client his constitutional right to a jury trial because he had not been paid. Even though he had not received the second $15,000, Moore successfully represented Moore during the suppression hearing in that he convinced Judge Williams to grant the motion. He then represented Moore on the appeal of the suppression motion. Although the Fourth Circuit reversed the district court, Moore acknowledged that McDaniel was "zealous" in his advocacy during the oral argument, which Moore attended. In advance of the trial, McDaniel prepared for testimony not only Moore, but also five defense witnesses. Had McDaniel been so dissatisfied with the failure to pay the full retainer that he would seek to reduce his workload by coercing Moore to accept a bench trial, it stands to reason that there would have been some evidence of cutting corners earlier in the representation. There was none.

Finally, there is also no sign in McDaniel's history as an attorney that he would engage in this type of misconduct. McDaniel testified that it is not "uncommon" for a client to fail to pay fees as promised. Nevertheless, in cases eligible for a jury trial, he had previously conducted approximately 30 to 40 jury trials without ever having a client proceed to a bench trial. If McDaniel believed it is both beneficial and appropriate to require a client to choose a bench trial in cases in which he had failed to pay his attorney fees, there likely would be at least one prior example of one of his clients waiving his right to a jury trial. There was none. Rather, where the Moore case was unique in McDaniel's experience in that he had never had a court grant a

suppression motion only to have it overturned on appeal and remanded for trial, it is more likely that McDaniel's recommendation of a bench trial was based on those unique circumstances rather than the common occurrence of a client failing to make timely and complete payments of attorney's fees. The Court therefore credits the testimony of McDaniel, not Moore, on the reason for McDaniel's recommendation of a bench trial.

The testimony of former Assistant United States Attorney Jonathan Lenzner does not alter this conclusion. Lenzner's testimony that McDaniel notified the Government of Moore's intention to seek a bench trial in advance of the October 2012 trial date is inconsistent with Moore's claim that McDaniel extracted the agreement to waive a jury trial shortly before the second trial date in February 2013. Although Lenzner's testimony that McDaniel characterized the decision as driven by Moore's wishes and stated that he was trying to talk Moore out of a bench trial is arguably inconsistent with McDaniel's account, the parties agree that this statement was likely an attempt to deflect attention away from the true reason for the decision to seek a bench trial. It is not inconsistent with McDaniel's assertion that it was a strategic decision based on McDaniel's assessment of how Judge Williams would view the case, because it is understandable that McDaniel would not have been completely forthcoming in explaining the perceived advantages of a bench trial where the Government had to consent to a bench trial in order for it to proceed.

In the end, Moore is left with the argument that because McDaniel now acknowledges that the choice of a bench trial proved to be the wrong strategy, the only reasonable explanation for that choice is that McDaniel improperly insisted on it for financial reasons. Although hindsight is 20-20, McDaniel articulated his reasons for the choice, including not only the possibility, based on his grant of the suppression motion, that Judge Williams believed that the

Government may have acted inappropriately, but also the understanding that while it was unlikely that he would be able to present evidence to the jury that Moore was known as the "Teflon defendant" as an explanation for why the Government would have sought to plant evidence against him, that information was already known to Judge Williams. Where the Court finds McDaniel's testimony to be credible, McDaniel articulated a reason for recommending a bench trial based on trial strategy, the Court concludes that McDaniel's recommendation that Moore waive his right to a jury trial was unconnected to Moore's failure to pay attorney's fees or any potential financial conflict of interest.

Accordingly, Moore cannot establish ineffective assistance based on a conflict of interest under *Cuyler*. Although Moore has articulated an alternative defense tactic, specifically, declining to waive a jury trial, and that tactic was objectively reasonable, he has not established that "the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict" of interest. *See Stitt*, 552 U.S. F.3d at 351 n.4. Likewise, where McDaniel did not condition his representation of Moore on consent to a bench trial, Moore's waiver of his right to a jury trial before Judge Williams was knowing, intelligent, and voluntary. Finally, in the absence of a connection to a financial conflict of interest, McDaniel's trial strategy to waive a jury trial, even if ultimately unsuccessful, did not constitute ineffective assistance of counsel. *See Strickland*, 466 U.S. at 689-90 (stating that a defendant making a claim of ineffective assistance of counsel must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy" (quoting *Michel v. State of Louisiana*, 350 U.S. 91, 101 (1955))); *e.g.*, *Wyatt v. United States*, 591 F.2d 260, 267 (4th Cir. 1979) (holding that "ineffective assistance of counsel was not established" where counsel made a "considered judgment . . . in choosing a bench rather than jury trial"). Even if it constituted

deficient performance by counsel, Moore has not shown prejudice in that there was a reasonable probability that the outcome would have been different. *See Strickland*, 466 U.S. at 694.

## CONCLUSION

For the foregoing reasons, Moore's Motion is denied. A separate Order shall issue.


Date: August 29, 2017

_____
THEODORE D. CHUANG
United States District Judge